IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEYAH FAHNBULLEH,** | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **CARELINK COMMUNITY** | : | |
| **SUPPORT SERVICES, INC.,** | : | |
| Defendant. | : | No. 08-5055 |
| | : | |

**MEMORANDUM**

Schiller, J.                                                                                            December 4, 2009

Plaintiff, a thirty-one year old Liberian woman, brings this action, pursuant to Title VII, against her former employer Carelink Community Support Services, Inc. ("CCSS"). Plaintiff asserts that she was sexually harassed by her direct supervisor, terminated in retaliation for complaining about the harassment and discriminated against based on her race and national origin. Currently before the Court is Defendant's motion for summary judgment. For the following reasons, the motion is granted.

**I.      BACKGROUND**

   **A.      Plaintiff's Employment and Termination**

CCSS operates the Moderate Care facility ("Modcare"), which provides assistance to mentally-ill individuals who reside there. (Def.'s Mot. for Summ. J. Ex. A [Deposition of Vickie Tully] at 18–20.) Plaintiff was hired on June 30, 2003 by CCSS's Director of Human Resources Vickie Tully to be a Residential Counselor. (*Id.* at 15–16.) Residential Counselors such as Plaintiff are responsible for teaching independent living skills to Modcare residents. (*Id.* at 20.) A

Residential Counselor is always on staff to assist residents, with one Residential Counselor staffed on each shift. (*Id.* at 58.)

Plaintiff worked the 4:00 p.m to 12:00 a.m. shift on Monday through Friday. (Def.'s Mot. for Summ. J. Ex. D [Dep. of Weyah Fahnbulleh] at 52, 101.) Jonathan Toomey, the Program Director at Modcare, was Plaintiff's direct supervisor. (Def.'s Mot. for Summ. J. Ex. H [Dep. of Jonathan Toomey] at 15.) Toomey worked Monday through Friday from 9:00 a.m to 5:00 p.m. (*Id.* at 12.) Ted Colomeda, the CCSS Regional Director and Toomey's supervisor, worked the same hours as Toomey. (Fahnbulleh Dep. at 68.)

As outlined in the CCSS Employee Handbook, Residential Counselors at CCSS may not leave the work site during their shifts without supervisory approval. (*Id.* at 48–49.) With a supervisor's permission, however, an employee could leave the site for a maximum of fifteen minutes to get food. (Tully Dep. at 38; Toomey Dep. at 83–84.) Plaintiff acknowledged that employees who are given permission to leave the site for food are "expect[ed] . . . to be reasonable, [to] go and grab food and come back or eat something and come back." (Fahnbulleh Dep. at 50–51.)

Sometime in 2007, Clare Bradley, a Modcare resident, complained to Toomey regarding Plaintiff's treatment of residents and Plaintiff's propensity for leaving the site unattended during her shift. (Toomey Dep. at 54–61.) Bradley also sent a letter to Colomeda, dated October 5, 2007, complaining about Plaintiff's demeanor at work. (Def.'s Mot. for Summ. J. Ex. K [Bradley Letter to Colomeda].) Based on these complaints, Tully, Toomey, and Colomeda decided to conduct a site check. (Tully Dep. at 83.) Site checks are a standard procedure at CCSS whereby two supervisory level staff members visit a site unannounced to investigate potential problems or past complaints. (*Id.*; Def.'s Mot. for Summ. J. Ex. B [Deposition of Ted Colomeda] at 70. )

2

On October 12, 2007, Colomeda and Toomey conducted a site check to determine whether Plaintiff was leaving the site unattended during her shift. (Colomeda Dep. at 24.) They arrived at Modcare at approximately 5:30 p.m. and discovered that Plaintiff was not there. (*Id.* at 25; Toomey Dep. at 88–89; Def.'s Mot. for Summ. J. Ex. L [Toomey Evening Check Report]; Def.'s Mot. for Summ. J. Ex. M [Colomeda's 10/12/07 email].) They also observed that the company van was missing. (Toomey Dep. at 90; Colomeda Dep. at 25–26.) They proceeded to Plaintiff's home and saw the company van parked outside of her house.[1] (Toomey Dep. at 90–91; Colomeda Dep. at 25–26; Toomey Evening Check Report; Colomeda's 10/12/07 email.) After waiting several minutes, Colomeda and Toomey returned to Modcare and called Plaintiff to request that she return to the site. (Colomeda Dep. at 25–26; Toomey Dep. at 91.)

When Plaintiff returned sometime between 6:15 and 6:30 that evening, Colomeda, in accordance with CCSS procedures, asked her to prepare a written statement regarding her whereabouts for the previous hour. (Fahnbulleh Dep. at 175; Colomeda Dep. at 47, 73–74; Toomey Dep. at 93–94.) Plaintiff's statement reads:

> I left the site at about 5:30 p.m. to get some food to eat. I made a quick stop at the bank ATM to get money. The food was not ready so I decided to pick up some food from my house and just in that time the supervisors called for me to come back to the site for a meeting.

(Def.'s Mot. For Summ. J. Ex. N [Pl.'s Statement].) At that time, Plaintiff did not indicate that Toomey had given her permission to leave the site. (*Id.*; Colomeda Dep. at 47–48.) Colomeda sent Plaintiff home and told her that she would be contacted by Human Resources. (*Id.* at 32.)

Colomeda informed Tully of the results of the site check. (*Id.* at 49; Tully Dep. at 39.) Tully

---

[1] Plaintiff confirms that she was home at the time but denies having taken the company van. (Fahnbulleh Dep. at 174–75.)

subsequently reviewed Plaintiff's statement and written statements prepared by Colomeda and Toomey, then discussed the matter with Colomeda and Toomey. (*Id.* at 52, 54.) As a result of her review, Tully terminated Plaintiff for leaving the work site without supervisory permission. (*Id.* at 40–41, 89.) Toomey did not have the capacity to terminate Plaintiff and he never told Colomeda or Tully that Plaintiff should be terminated. (Toomey Dep. at 96–97; Colomeda Dep. at 89.) Likewise, Colomeda had no authority to terminate Plaintiff. (Colomeda Dep. at 89.)

On October 17, 2007, Plaintiff received a termination letter, which stated that she was being terminated because "on October 12, 2007 [she] left the work site *with* supervisory approval." (Def.'s Mot. for Summ. J. Ex. E [Oct. 16, 2007 Termination Letter] (emphasis added).) The letter informed Plaintiff that she could "grieve this decision" but Plaintiff did not file a grievance. (*Id.*; Fahnbulleh Dep. at 180.) Tully ultimately learned that this letter contained a typographical error and directed that an accurate termination letter be sent to Plaintiff. (Tully Dep. at 63.) The second letter, dated December 19, 2007, explained that:

> [T]he previous termination letter sent to you contained a mistake. The termination letter should have read "The reason for the termination is that on October 12, 2007 you left the work site without supervisory approval."

(Def.'s Mot. for Summ. J. Ex. F [Dec. 19, 2007 Letter].)

Plaintiff now asserts that she had permission from Toomey to leave the site on October 12, 2007 to get food. (Fahnbulleh Dep. at 165–67.) She claims that she saw Toomey when she arrived at 4:00 p.m. that day and that Toomey gave her permission to leave. (*Id.* at 165–69.) Toomey denies this assertion. (Toomey Dep. at 85.) He testified that he could not have given Plaintiff any such permission because he was at a diversity training, which lasted from 8:30 a.m. to 5:00 p.m., on October 12, 2007. (*Id.*) Sign in sheets confirm that Toomey attended the training on that date.

4

(Def.'s Mot. for Summ. J. Ex. P [Sign-in Sheets].) Janel Francis, a Carelink employee who attended the training, executed an affidavit confirming that the training lasted until 5:00 p.m. and that Toomey was present the entire time. (Def.'s Mot. for Summ. J. Ex. Q [Francis Aff.].) Moreover, Tully testified that prior to terminating Plaintiff she asked Toomey whether he had given Plaintiff permission to leave the site and Toomey responded that he had not given Plaintiff permission because he was at a diversity training that day. (Tully Dep. at 57.)

Toomey testified that, even if he had granted Plaintiff permission to leave the site, she would not have been permitted to leave for an hour. (Toomey Dep. at 131–32.) Likewise, Tully stated that, even if Plaintiff had permission to leave the site to get food on October 12th, the extent of Plaintiff's absence would still have resulted in her termination. (Tully Dep. at 89.)

### B. Plaintiff's Allegations of Sexual Harassment

According to Plaintiff, in June of 2007, Toomey asked Plaintiff if she had a boyfriend and told Plaintiff that she had nice breasts. (Fahnbulleh Dep. at 109–12.) Plaintiff reported Toomey's comments to Colomeda the following day. (*Id.* at 112–13.) A few weeks later, Toomey complimented Plaintiff on her hair and told her that she looked beautiful. (*Id.* at 121–24.) A few weeks after that, Toomey told Plaintiff that she had a "nice pantsuit" on an occasion when she wore a pantsuit to work. (*Id.* at 123–25.) Plaintiff did not report these comments to Colomeda. (*Id.* at 125, 133.)

In August, Toomey touched Plaintiff's shoulder and back, and touched her breast "for a few seconds." (*Id.* at 126–28.) According to Plaintiff, she reported this incident to Colomeda the following day and Colomeda represented that he would investigate the matter. (*Id.* at 130–34.) Despite Plaintiff's complaints, Plaintiff never heard back from Colomeda about Toomey's conduct.

5

(*Id.* at 134.)

According to Plaintiff, after she complained in August, Toomey criticized her and was not as helpful as he had been prior to that point. (Fahnbulleh Dep. at 134–41.) In the fall of 2007, Plaintiff said to Toomey, "I don't know why you are after me," to which Toomey allegedly replied, "[I]f you need this job so bad, you're going to have to look for another job, because I'll make sure you lose it." (*Id.* at 141, 185–86.) Regardless, on September 27, 2007, Plaintiff quit her part-time job, where she had no problems, and continued to work at Modcare. (*Id.* at 185–87.)

Toomey denies Plaintiff's allegations of harassment. (Toomey Dep. at 43–50, 79.) Additionally, Colomeda denies that Plaintiff complained to him about Toomey. (Colomeda Dep. at 45–46.) Since Colomeda was not aware of Plaintiff's allegations, he did not inform Tully of them. (*Id.* at 75–76.) In fact, neither Toomey nor Tully was aware of Plaintiff's complaints of sexual harassment until Plaintiff filed an EEOC complaint after she was terminated. (Toomey Dep. at 118–19; Tully Dep. at 36.)

### C. Plaintiff's Allegations of Race and National Origin Discrimination

Plaintiff's race-based complaints arise out of three instances: First, Plaintiff once wore open-toed shoes to work, which violated the dress code, and Colomeda told her to go home and change her shoes or take the day off. In contrast, Sue St. John, a white employee who lived further away from their worksite, wore open-toed shoes that day and was allowed to stay on site. (Fahnbulleh Dep. at 161–64.). Second, Toomey, based on Colomeda's review of Modcare records, wrote Plaintiff up for being behind in updating her treatment plans for residents, whereas Doreen Pallor, a white employee, did not complete her treatment plans but was not written up. (*Id.* at 148–49.) Third, white employees—Joanna Lombardo and Doreen Pallor—allegedly took long lunch breaks

6

without incident. (Fahnbulleh Dep. at 102, 175–76.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Plaintiff's Sexual Harassment Claim Fails

Title VII prohibits sexual harassment that creates a hostile work environment. To succeed on such a claim, a plaintiff must establish: (1) that she was intentionally discriminated against because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination

detrimentally affected her; (4) the discrimination would detrimentally affect a similarly situated reasonable person; and (5) a basis for *respondeat superior* liability. *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001); *see also Huston v. Proctor & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). To satisfy the second element, "the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Weston*, 251 F.3d at 426 (citing *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986)). A court should consider several factors in determining whether an environment is hostile or abusive, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Whether conduct is pervasive and regular should be determined based on the totality of the circumstances. *Harris*, 510 U.S. at 23. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citation omitted).

Plaintiff's claim rests on a handful of comments and one incident during which Toomey allegedly touched her back, shoulder, and breast. Toomey's offhand comments about Plaintiff's clothes and appearance are not sufficiently pervasive or severe to create a hostile work environment. *See Shramban v. Aetna*, 115 F. App'x 578, 579 (3d Cir. 2004) (supervisor's repeated comments about blonde plaintiff's personal life, clothes, jewelry, and appearance, including comment that "there is only one way to tell a natural blonde" were not pervasive or regular). Indeed, none of the comments at issue are physically threatening or humiliating. Plaintiff herself did not deem Toomey's comments concerning her appearance or wardrobe — "you look beautiful," "nice hairdo," "nice

pantsuit" (Fahnbulleh Dep. at 122–23)— sufficiently offensive to warrant a complaint to Colomeda (*Id.* at 125), and there is no indication that the comments affected her work performance. Nor did the comments, which were made weeks apart over the course of a two month period, occur with sufficient regularity to be considered pervasive.

The one instance in which Toomey allegedly touched Plaintiff's breast, even taken in combination with these comments, does not alter the conclusion that Toomey's conduct was insufficiently severe or pervasive to alter the conditions of Plaintiff's employment. Such a brief single incident, though inappropriate, could not establish a hostile work environment, even when considered with Toomey's sporadic comments. *See Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439–40 (E.D. Pa. 2001) (granting summary judgment on hostile work environment claim when plaintiff asserted that her supervisor: (1) touched her breast, told her that she looked "fresh" and propositioned her to join him later that evening; (2) made suggestive comments about plaintiff's eyes and offered his financial assistance if plaintiff would go out with him; (3) removed a bottle of wine from his pants, offered plaintiff a drink and asked her to join him at a hotel where they could have a "good time;" and (4) patted plaintiff on the breast and buttocks after complimenting her on good work); *McGraw v. Wyeth-Ayerst Labs., Inc.*, Civ. A. No. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (finding no hostile work environment where supervisor made repeated requests for dates, forced his tongue down plaintiff's throat without her consent, touched plaintiff on the face, and yelled at plaintiff in her cubicle); *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463–65 (6th Cir. 2000) (supervisor's rubbing employee's shoulders, grabbing buttocks, and offensive comments not pervasive or severe). Furthermore, there is no evidence that Plaintiff felt physically threatened by Toomey's action or that it interfered with her ability to do her job.

Since the conduct of which Plaintiff complains, taken as a whole, is insufficiently pervasive or severe to support a hostile work environment claim, the Court will grant summary judgment to Defendant on Plaintiff's hostile work environment claim.

### B. Plaintiff's Retaliation Claim Fails

To establish a *prima facie* case of Title VII retaliation "an employee must prove that (1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007). "If the employer is not aware of the protected activity, there can be no charge of retaliation." *Brown v. Boeing Co.*, 468 F. Supp. 2d 729, 737 (E.D. Pa. 2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 505 (3d Cir. 1997)).

The fact that Tully was unaware of Plaintiff's complaints of sexual harassment when Tully decided to terminate Plaintiff is fatal to Plaintiff's retaliation claim. *See Red v. Potter*, 211 F. App'x 82, 85 (3d Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff "ha[d] not shown that there [was] a material issue of fact that the officials responsible for her demotion and ultimate termination . . . were aware of her EEO filings at the time of their actions"); *Preston v. Bell Atl. Network Servs., Inc.*, Civ. A. No. 96-3107, 1997 WL 20853, *10 (E.D. Pa. Jan. 16, 1997) ("[A]ny negative influence Mr. Vogt may have had in Mr. Marshall's decision did not include notice to Mr. Marshall of Plaintiff's prior complaints of harassment."); *Bedford v. Se. Pa. Transp. Auth.*, 867 F. Supp. 288, 293 (E.D. Pa. 1994) ("If the person who decided that plaintiff's employment should be terminated had no knowledge that she had engaged in the protected activity in question, then clearly he could not have retaliated against her for so doing."). Viewing the evidence in the

light most favorable to Plaintiff, she has at most established that Colomeda was aware of her problems with Toomey. However, there is no evidence that Colomeda relayed Plaintiff's concerns to Tully. Although Tully spoke with Colomeda regarding his observations during the site check, nothing in the record suggests that he mentioned Plaintiff's complaints of sexual harassment at that time. To the contrary, Tully testified that she first learned of Plaintiff's allegations of sexual harassment only after Plaintiff was terminated. Since there is no evidence that Tully was aware of Plaintiff's complaints at the time Tully made the decision to terminate Plaintiff, Plaintiff cannot establish a causal link between the two events.[2]

Nor has Plaintiff raised an inference of retaliation solely due to the temporal proximity of her termination to her complaints. Temporal proximity between the protected activity and the adverse employment action must be "unusually suggestive" to establish a causal link on its own. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). "Time periods as short as two months, without additional evidence, are not 'unnecessarily suggestive' to demonstrate causation." *Brown*, 468 F. Supp. 2d at 736 (collecting cases); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month time period between protected activity and plaintiff's termination not unduly suggestive). The mere fact that Plaintiff complained of sexual harassment in August and was terminated in October cannot sustain her retaliation claim in the absence of any other evidence of retaliation. Since Plaintiff has failed to adduce any such evidence, her retaliation claim fails.

---

[2] To the extent that Plaintiff's retaliation claim is based on Toomey's criticism of Plaintiff after June of 2007, her claim fails for the same reason. Since there is no evidence that Toomey was aware of Plaintiff's complaints to Colomeda while she was employed by CCSS, Plaintiff cannot establish any retaliatory motive on Toomey's behalf.

## C. Plaintiff's Race and National Origin Discrimination Claims Fail

Absent direct evidence, Title VII race and national origin discrimination claims are governed by the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To avoid summary judgment, the plaintiff must first make out a *prima facie* case of discrimination by demonstrating that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) this occurred under circumstances that raise an inference of discriminatory action, such as when a similarly situated person not of the protected class is treated more favorably. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff meets this test, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment decision. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). If the defendant satisfies this burden, the plaintiff must then produce some evidence from which a jury could reasonably find that the employer's proffered explanation for taking the action was false, and that discrimination was the real reason for the adverse employment action. *Id.*

Plaintiff fails to establish a *prima facie* case of race or national origin discrimination. The circumstances of her firing do not raise an inference of discriminatory action. After Plaintiff was fired, she was replaced by two women who shared her race and national origin. (Colomeda Dep. at 21–22.) In addition, Kla Brownell, a Liberian male employee, also left the site unattended but was not fired, suggesting that any differential treatment Plaintiff received was not based on her race or national origin. (Fahnbulleh Dep. at 197–98.) In fact, a majority of the staff at Modcare are Liberian. (Toomey Dep. at 130.) Plaintiff's mere assertion that white co-workers Doreen Pallor and Joanna Lombardo took long lunch breaks without reprimand, in light of the remaining evidence, fails

to raise the necessary inference of racial or national origin discrimination.

To the extent that Plaintiff's race and national origin discrimination claims are premised on her allegations that she was sent home for wearing open-toed shoes and written up for failure to complete her treatment plans, they still fail because they are insufficient to establish a tangible adverse employment action. The Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). Being sent home to change one's shoes and receiving a single written warning are insufficiently adverse to constitute actionable discrimination. Furthermore, the written warning did not occur under circumstances that raise an inference of discriminatory action. The white colleague with whom Plaintiff compares herself, Doreen Pallor, was working in a different position, under a different supervisor, at a different facility, during a different time when she was late with her treatment plan. (Fahnbulleh Dep. at 149–51.) Therefore, Plaintiff's claims of race and national origin discrimination fail.

## IV.   CONCLUSION

The conduct of which Plaintiff complains is insufficient, as a matter of law, to establish a hostile work environment claim. Additionally, since Plaintiff cannot illustrate that she was terminated because she complained about her supervisor's behavior, summary judgment is warranted on her retaliation claim. Furthermore, Plaintiff fails to establish a *prima facie* case of race or national origin discrimination. An order granting Defendant's motion will be docketed separately.